PACIFIC MUT. LIFE INS. CO. OF CALIFORNIA v. HALE. (No. 1668.)*

(Court of Civil Appeals of Texas. El Paso. Nov. 13, 1924. Rehearing Denied Dec. 4, 1924.)

1. Insurance ⬅125(2), 147(2) — Policy held governed by law of state in which executed and delivered to insured.

Validity, interpretation, and obligation of policy, applied for, executed, and delivered to insured by California corporation, through its agent, in North Carolina, from which insured subsequently moved to Texas, held governed by laws of North Carolina, in absence of provision as to place of performance, laws of Texas applying only as to remedy and procedure.

2. Appeal and error ⬅930(1) — Appellee's version as to conflicts in testimony assumed true.

In deference to jury's findings for plaintiff, in action on health insurance policy, it must be assumed, as to conflicts between his and physician's testimony on issue as to truthfulness of answer to question, as to prior illnesses and treatments by physicians, that plaintiff's version is true.

3. Insurance ⬅291(2), 292—False representation as to illnesses and treatments by physicians before application held material as matter of law.

Under C. S. N. C. §§ 6289, 6483, false representation, in answer to question in medical examiner's report, that insured had had no other illness than one specified, nor been treated by any other physician than one named for 7 years preceding application, is material, as matter of law, as affecting acceptance of risk and hazard assumed by insurer.

4. Insurance ⬅251—Materiality of false representations in application held not governed by law of forum as relating merely to remedy.

Materiality of false representations, in answer to questions in medical examiner's report as to previous illnesses and treatment by physicians, held matter of substantive law, and hence governed by law of state in which policy

was executed and delivered, not by Rev. St. art. 4959, as relating merely to remedy.

**5. Insurance ⬤⟜670—In view of materiality of certain false representations, findings of no intent to deceive, of freedom from certain disease within stated period before application, held immaterial.**

False representations as to freedom from other illnesses than influenza, and nontreatment by other physicians than one named during certain period before application, being material to risk under law of state in which policy was executed and delivered, findings that insured did not intend to deceive and did not have tuberculosis during such period were immaterial and did not warrant recovery, though supported by evidence.

Appeal from District Court, El Paso County; P. R. Price, Judge.

Action by Joseph Weatherby Hale against the Pacific Mutual Life Insurance Company of California. Judgment for plaintiff, and defendant appeals. Reversed, and rendered.

Dyer & Morton, of El Paso, for appellant.

W. E. Rogers and C. L. Galloway, both of El Paso, for appellee.

HIGGINS, J. Appellant, a California corporation, issued to the appellee Hale a life, health, and accident insurance policy, dated January 6, 1923. At that time, and prior thereto, Hale was a resident of North Carolina, in which state the appellant was doing business. The policy was delivered to Hale in that state where he continued to reside until his removal to El Paso, Tex., in May, 1923. The policy insured Hale "against disability commencing while this policy is in force and resulting from sickness"; such sickness "to be such as will result in continuous, necessary, and total loss of all business time." The rate of indemnity was fixed at $150 per month during the continuance of such disability, provided that no indemnity should be paid for the first two months of any period of disability.

This suit was brought by Hale in El Paso county upon the policy alleging that on April, 12, 1923, he became disabled from pulmonary tuberculosis and has remained so disabled. Recovery was sought for the monthly payments contracted to be paid excluding the first two months of disability. Recovery was also prayed for interest, attorneys fees, and the penalty as provided by the Statutes of Texas. Plaintiff recovered judgment as prayed for, and the defendant appealed.

The defendant in bar of the action and as the basis of a cross-action for rescission, pleaded that the contract was governed by the laws of North Carolina, which were specifically set up, and that the policy was procured—

"by said plaintiff by reason of material misrepresentations of fact made and contained in answers made by said plaintiff to questions contained in the written application, and to questions asked said plaintiff by the defendant's medical examiner in connection with said application in this: that in the application, question No. 15 is as follows: 'Have you ever had or have you now any bodily or mental infirmity or deformity (including hernia and rupture), or have your impaired hearing, any disease of either eye, lost a limb or the sight of an eye, or are you in any respect maimed or in unsound condition mentally or physically? (Give particulars.)' To which the plaintiff answered: 'No.' The said application was duly signed by said plaintiff, and a photographic copy thereof attached to the policy. And in that in questions to be asked by the medical examiner, which is a part of the application, and in question 5 thereof, subsection (C), the plaintiff was asked: 'Have you ever had or been treated for: * * * (C) Influenza, pneumonia, pleurisy, bronchitis, or tuberculosis?' Answer: 'Yes; three weeks with flu in 1918.' And in section (L) of said question 5, plaintiff was asked: '(L) Have you given full information about each disease or symptom mentioned above which you have ever had or been treated for?' To which plaintiff answered: 'Yes.' And in that in question 6 the plaintiff was asked: 'Have you had any injuries or illnesses or consulted or been treated by any physician or practitioner during last seven years?' To which the plaintiff made answer as follows: 'Give particulars each illness, injury consultation and treatment: Flu. Date: 1918. Duration: Three weeks. Result: Excellent. Physician's name and address: Dr. W. I. Taylor, Burgaw, N. C.'

"That said questions to be asked by the medical examiner were duly signed by said plaintiff, and are a part of the application; photographic copies of all being attached to the policy. That the answers aforesaid made by said plaintiff to said questions 15 and 5 (L) were false and untrue; that the answers made by plaintiff to questions 5 (C) and 6 were incomplete, and in that respect were false and untrue, and that within the period of seven years immediately preceding the date of said application, which bears date of December 8, 1922, the plaintiff had had, or had been treated for, a condition described as: 'Stooped, flushed face and tubercular facies—mouth neg.—some chronic pharyngitis. Chest neg., save rales and leathery rub at left base post.' And that the answer made by plaintiff to question 6 was false and untrue, because plaintiff consulted or had been treated by a physician or practitioner within the seven years preceding the date of said application. to wit, during the month of December, 1919, and January, 1920. At said time plaintiff consulted or was treated by Dr. James R. Robertson, of Wilmington, North Carolina, who made the finding hereinabove quoted, as: 'Stooped, flushed face and tubercular facies—mouth neg.—some chronic pharyngitis. Chest neg., save rales and leathery rub at left base post.' He had an X-ray picture made of plaintiff's chest, and advised plaintiff to go to Asheville, North Carolina, and put himself under the care of a tubercular specialist. That said false and untrue answers and misrepresenta-

tions, made by plaintiff as aforesaid, materially affected the acceptance of the risk and the hazard assumed thereunder by defendant company, in connection with the issuance of the policy herein sued upon, and were material misrepresentations and were of such character as to entitle this defendant to rescind said policy and contract of insurance, and the defendant would not have issued said policy, had it known the truth."

It was further pleaded that if the laws of North Carolina did not apply then the contract was governed by the laws of California which were pleaded, and that under the laws of that state the matters above set up avoided the contract.

The court submitted three questions to jury with accompanying instructions as follows:

"Question No. 1. Do you find from the evidence that the failure of plaintiff, in response to questions propounded by the medical examiner of the company, to mention that in the latter part of 1919, or in January, 1920, he was treated by a physician, amounted to the misrepresentation or concealment of a fact material to the risk in the policy for which he was applying? Answer Yes or No.

"In connection with this question, you are charged that a fact is material to an insurance risk which would reasonably induce the company to decline the insurance.

"Question No. 2: Do you find from the evidence that plaintiff's failure to answer that he had been treated by Dr. Robertson in 1919 or 1920 was a concealment of a fact material to the risk? Answer Yes or No.

"You will look to the direction given you under question No. 1, in answering this question, as to what is material fact in an insurance risk. If you have answered question No. 1, and No. 2 in the negative, then answer this additional question:

"Question No. 3. Do you find from the evidence that the plaintiff, with intent to deceive the defendant company, failed to mention the fact of his illness in 1919 or 1920, and his treatment by Dr. Robertson     Answer Yes or No."

The above questions were answered in the negative.

At the request of defendant these additional questions were asked:

"No. 1. Do you find from the evidence that if plaintiff had given information concerning symptoms of his illness, consultation and treatment in December, 1919, and January, 1920, that defendant would have issued the policy herein? Answer Yes or No.

"No. 2. Do you find from the evidence that the plaintiff had tuberculosis on the 14th day of December, 1922? Answer Yes or No.

"No. 3. Do you find from the evidence that plaintiff on or before December 14, 1922, had been advised that he had tuberculosis? Answer Yes or No.

"This issue is to be answered in the event you answer defendant's special issue No. 2 in the affirmative, otherwise you will not answer same.

"No. 4. Do you find from the evidence that plaintiff had tuberculosis during December, 1919, or January, 1920? Answer Yes or No."

No. 1 was answered Yes; Nos. 2 and 4 were answered No; No. 3 was not answered, in accordance with the conditional instruction given by the court. The medical examiner's report and the questions therein answered by appellee is dated December 14, 1922.

Appellant presents numerous assignments, but under the view which we have of the case it is necessary to consider only the sixteenth, which complains of the refusal of a peremptory instruction in favor of the defendant, and those which question the sufficiency of the evidence to support the jury's findings.

[1] The validity, interpretation, and obligation of the contract is to be governed by the laws of either North Carolina or California. The laws of Texas apply only as to matters of remedy and procedure.

In cases where the application is made in one state and the same accepted in another, it sometimes is difficult to determine in which state the contract was finally executed but in the state of the pleadings here there is no difficulty of the kind. The plaintiff alleged that the defendant was doing business in North Carolina, and, on January 6, 1923, through its regularly constituted agent at the city of Wilmington in said state, made, executed, and delivered to him the policy in question. The defendant pleaded that the application was taken in North Carolina by its agent in that state, and the policy delivered to plaintiff by said agent in said state after the same had been there countersigned by its agent and the premium then paid. These affirmative allegations of both parties each show that the contract was finally executed in North Carolina, and it is governed by the laws of that state, the policy itself being silent as to the place of performance.

[2] The controlling question arises upon appellee's answer to question No. 6 contained in the medical examiner's report. This answer imports that except for an illness of influenza in 1918, continuing for three weeks when he was treated by Dr. Taylor, he had had no other illness for the 7 years preceding the application, and during that time had been treated by no other physician.

This was untrue according to his own testimony, as shown by the following excerpts:

"I did not consult or call on Dr. Robertson in December, 1919, but I did call on him in January, 1920. As to what I went to him for —well, the first, I had a fever, he said it was typhoid fever, and sent me to the hospital, and he pronounced it a cold. I stayed five days, and that is all there is to it. Yes, sir; he had an X-ray made of my chest, had my sputum examined, and kept me under observation at that hospital five days. When I went to him at first I did not tell him that I had been suffer-

ing from a pain in my back of such intensity that I had to have morphine to ease it. I didn't tell him anything about morphine, and he didn't give me any. I did not tell him that I had had morphine recently to ease the pain. Yes; I had a little pain, and I had fever. After keeping me in the hospital five days, he did not tell me I had tuberculosis, and he did not tell me to go to Asheville, N. C., and put myself under the care of Dr. Minor, a tubercular specialist. What he did tell me was he advised me to go to see a specialist; he said he couldn't find anything the matter with me, and recommended Dr. Minor. He didn't tell me to go to him, he recommended him, but he didn't tell me to go. They say that is a T. B. resort, a place where tubercular people go; I have never been there. At the time I went to Dr. Robertson, in 1920, I did so voluntarily. I chose him myself, without suggestion from anybody else. At the time I went to him, in January, 1920, I did not tell him I had a pain in my back for about ten days, and that I was nauseated somewhat. I say that after this test was made, and after keeping me in the hospital, he advised me to go and see a specialist, and recommended Dr. Minor. Yes; he mentioned his name, but he didn't care where I went, he just recommended him. I did not know Dr. Minor was a noted tubercular specialist; I don't know that now, only what he told me, he recommended him. Dr. Robertson told me Dr. Minor was a tubercular specialist, he said he was a chest specialist, and advised me to go there for examination. I didn't go because I didn't think it was necessary. I didn't try to get Dr. Robertson to get me in some state sanatorium. * * * "

"At that time, in Mr. Schroeder's office, I did not admit to them, or to Mr. Schroeder or Mr. Zoeller, in his presence, that Dr. Robertson was consulted by me and told me about having T. B. in January, 1920, but that I didn't believe it was so. I didn't tell him such a thing. I didn't say anything about T. B., or tuberculosis or pulmonary tuberculosis. I did not say, in the presence of Mr. Zoeller and Mr. Schroeder at that time, on August 29th, that Dr. Robertson had told me the things that are contained in that notice just read. No, sir; I didn't believe they were so. I told them he advised me to see a specialist, but I didn't name Dr. Minor. Dr. Robertson mentioned him, and that he was a chest specialist, but I didn't say that to Mr. Schroeder. I told the truth all along. Nothing was said between Dr. Robertson and myself about me going to Asheville, he recommended a specialist at Asheville. When I talked to Mr. Schroeder and Mr. Zoeller, I didn't tell them what Dr. Robertson had told me, I told them he couldn't find nothing the matter with me, in 1920. I told Mr. Schroeder he recommended that I consult a specialist, but I didn't believe there was anything wrong with me. * * * "

"I didn't go to Dr. Robertson in December, 1919, but I did go to him in January, 1920— about the 10th of January. When I first went to him he told me he thought I had typhoid fever. I was under his care about six days, at the hospital in Wilmington. I was staying at the Y. M. C. A., and he thought best that I go to the hospital. If I had been home I wouldn't have gone. My home was in Virginia. I was a single man then, but I have married since. Dr. Robertson gave me medicine while I was at the hospital—it was quinine, I reckon. He ad-

vised me he was giving it for a cold. That was in January, 1920. At that time he had an X-ray made of my lungs, which he advised me showed nothing at all, that it was negative. At that time he also had my sputum examined, sent it to Raleigh, and advised me that it was negative. Dr. Robertson did not advise me that I had tuberculosis. As to why he advised me to go to Asheville—he thought there might be something wrong, but he couldn't find it. He did not send me there for treatment for tuberculosis. I was sick with that spell five or six days, not over six, and went back to work then. That was in January, 1920, and from then until April 4, 1923, my health was good. * * * "

"In answering the questions asked by the medical examiner, I did not mention about going to Dr. Robertson in 1920 because I didn't think of it. I did not fail to answer that question with the intention to defraud the company. I just had a cold in January, 1920. The physician certainly did tell me he found nothing the matter with me. He thought at first it was typhoid fever, and sent me to the hospital, and finally found nothing. * * * "

"I consulted Dr. Taylor at the time they had the first flu epidemic, I think it was in 1917. At that time he made no suggestion that I consult anybody about my lungs. In 1920, when I consulted Dr. Robertson, he couldn't find anything the matter and advised me to go and see a specialist. The flu is the only real sickness I had. No; I didn't go to the hospital when I had the flu, and didn't have an X-ray made or my sputum examined, I just had my lungs thumped on. In 1920 I not only had them thumped, but they made tests. When I answered that question, which asked for all physicians that I had consulted or been treated by within 7 years, I said Dr. W. I. Taylor, and I didn't think of the other. I had never had the tests made before, and the X-ray impressed itself on my memory, but I never thought of it until April 12th, when I went back he called my attention to it. I disagreed with him still. In April, 1923, I didn't agree with Dr. Robertson's finding; I didn't think I had it; and I went to Dr. Bellamy, whose deposition I have taken. Dr. Robertson recommended my going to this sanatorium; we didn't discuss it. I don't know whether he was going to try to get me in if he could; he didn't say anything about it. Surely, I went to Dr. Robertson when I had the breakdown in April, 1923, and he told me for the first time that I had pulmonary tuberculosis. Then I went to see Dr. Bellamy and he told me the same thing—he said I had it for six weeks, however. Dr. Robertson didn't examine me for the company in this case; I was examined by Dr. Duval. * * * "

"At the time of the spell in January, 1920, there was no suggestion or anything said about getting me in a sanatorium. When my health broke down in April, 1923, I went to Dr. Robertson for examination of my own volition, the man to whom I had gone when I had the six days' spell in 1920."

"In 1920 Dr. Robertson did not tell me he was worried about my condition, and recommend that I go to Asheville."

The testimony of Dr. Robertson in vital respects differs from the plaintiff's version, but in deference to the jury's findings it must be assumed as to such conflicts that

the plaintiff's version is true. However, much of Dr. Robertson's testimony is pertinent in the consideration of the materiality of the representations and we quote from his testimony as follows:

"I know Joseph Weatherby Hale, the plaintiff, and have known him since he came to see me as a patient December 22, 1919, when he first came to me as a patient. I know him only as a patient and in no other capacity. I did have a professional relationship with the plaintiff in December, 1919. He was treated by me in December, 1919. My relationship was that of physician to patient. He complained to me at that time of pain in the back, which had begun ten days previously, with pain around the navel and back and right side. Complained of some nausea and pain on urination with tenesmus. The attack had lasted four days, requiring morphine for the relief of it, and the pain returned after he got up out of bed. He was in bed four days. His appearance indicated stooped shoulders, flushed face and tubercular facies. Mouth negative. Some chronic pharyngitis. The chest examination was negative except for rales and a leathery rub at the left base posteriorly. His heart negative, abdomen negative and extremities negative. He gave me the following as his family history and previous personal history: Mother was living and well; father 70 years old, has cough; four brothers and three sisters living and well. One brother died of an accident, and as to his personal history he had influenza one year ago and told me he had malaria four years ago, about which I had some question. He denies any injuries or any operations. Temperature at 6 p. m. 98 F., pulse 80. Respiration 17. Urine examination: Specific gravity, 1010, acid, no albumen, no sugar. Occasional white blood cell and occasional red blood cell. Wassermann (blood) negative. Sputum—negative for tubercle bacilli (two separate examinations).

"From the above facts, ascertained from examination, I suspected tuberculosis, and on about January 10, 1920, sent him to the James Walker Memorial Hospital for several days for observation during which time I attended him. After this observation, I diagnosed his trouble as pulmonary tuberculosis, and advised him to go to Dr. Minor at Asheville, N. C., and take such treatment as he might give him. The above answer covers my treatment and consultation with patient up to April 10, 1923, when he consulted me again. His complaint on April 10, 1923, was that he had been having fever and pain in his left chest, which began five days previously, when he expectorated some bloody sputum containing streaks and clots of blood. The bloody streaks continued for three days. That is all he complained of, and he said, incidentally, he had gained 30 pounds since he had seen me in 1919. Temperature at five p. m. 99.4; pulse 100; respiration 20; good appetite; slept all right. Urine examination showed no albumen, no sugar, no white blood cell. Examination showed friction rub and dry rales in the left chest at the anterior exillary line at about the level of the second to fifth rib.

"I have given the full details as to conversation at the first treatment in December, 1919, and after the stay in the hospital in January, 1920. * * *

"I do not recall having given him any medi-cines. There was some la grippe and severe colds in Wilmington at the time I treated plaintiff in 1919 and 1920, but I did not diagnose Mr. Hale's case as la grippe or influenza. I had an X-ray picture made of plaintiff, but have no copy of it. I do not recall exactly what the X-ray picture showed, but it and the other examination together caused me to come to the conclusion that he had lung trouble. I sent his sputum to the state laboratory of hygiene at Raleigh, N. C., for examination for tubercle bacilli on two occasions, and at each examination it was negative. All this was in 1919 and 1920. I did not report to the plaintiff that the examination showed no tuberculosis, but no tubercle bacilli. I discharged the plaintiff about five days after observation and treatment at the hospital, but advised him to go to Asheville for treatment. The plaintiff did not have fever when he came to me for treatment and I did not diagnose his case as typhoid fever, or so inform him. I did not advise the plaintiff that he did not have tuberculosis, or that I thought probably his lungs might·be affected from cold or influenza, but I did advise him in 1920 to go to Dr. Minor, a lung specialist at Asheville, for examination. I made this recommendation because I diagnosed his case as pulmonary tuberculosis. * * *

"When I examined the plaintiff in 1919, I took his history, tested his temperature, pulse and respiration, made a complete physical examination of him, including urine analysis, blood Wassermann, sputum examination, and sent him to the James Walker Memorial Hospital, where I kept him for four or five days under observation, and during that time had his temperature, pulse, respiration, recorded every three hours, and had X-ray pictures made of his lungs. After completing the examination I advised him to go to Dr. Minor at Asheville, N. C., for treatment. * * * After the completion of the examination in January, 1920, I advised Mr. Hale that he had tuberculosis of the lungs, and that it would be best for him to go to Asheville, N. C., and put himself under the care of Dr. Minor."

Dr. Sawyer, assistant medical director of appellant, passed upon appellee's application and testified:

"It was part of my duties, as assistant medical director of the Pacific Mutual Life Insurance Company of California, to examine and approve or disapprove, on behalf of the Pacific Mutual Life Insurance Company of California, the medical examiner's report submitted with applications for insurance received by that company. When an application for insurance, with a medical examiner's report upon the applicant, was submitted to me, I determined from that medical examiner's report whether the application presented a satisfactory risk from a medical standpoint. During January, 1923, an application for noncancellable income insurance by Joseph Weatherby Hale, of Bolton, N. C., was submitted to me for examination, and at that time I passed upon said application. In passing upon said application, I examined the medical examiner's report signed by Joseph Weatherby Hale and by the local medical examiner for the company, Dr. T. Forney-Duval, dated at Bolton, N. C., December 14, 1922. The paper I have here is·the original medical

examiner's report of the examination of Joseph Weatherby Hale, made December 14, 1922, in connection with said Hale's application for noncancellable income insurance in the Pacific Mutual Life Insurance Company of California, and this is a photographic copy of the original medical examiner's report, Exhibit A hereto attached, which I first handed you; this other paper I have is the original application of Joseph Weatherby Hale, of Bolton, N. C., for noncancellable income insurance in the Pacific Mutual Life Insurance Company of California, dated December 8, 1922, and this is a photographic copy of the original application of Joseph Weatherby Hale which I first handed you (Exhibit No. 2 hereto attached). (Photographic copies of application and questions are attached to the policy of insurance heretofore introduced in evidence, being Exhibits No. 2 and No. 3 attached hereto.) After examination of the application of Joseph Weatherby Hale and the medical examiner's report thereon, I approved the application. In thus approving the application, I relied upon the information as to the applicant's condition of health, as shown by the answers to questions to be asked by medical examiner, being Exhibit No. 3, hereto attached, and the examiner's report, being Exhibit A hereto attached. If the medical examiner's report submitted to me with the application of Joseph Weatherby Hale, in January, 1923, had disclosed the fact that the said Joseph Weatherby Hale had consulted a physician or practitioner in December, 1919, that said physician or practitioner had examined him, and that said physician or practitioner had found rales at the base of the left lung, and had had an X-ray picture made of plaintiff's chest, and had advised plaintiff to go to Asheville, N. C., and put himself under the care of another physician or practitioner, and that plaintiff had at said time complained of pain in the back and side, running around to the umbilicus, and that said attack had occurred about 10 days previously and lasted about 4 days, and that the pain was so severe that plaintiff had to have morphine, and that said physician or practitioner had diagnosed plaintiff's condition as 'stooped, flushed face and tubercular facies—mouth neg.—some chronic pharyngitis, chest neg., save rales and leathery rub at left base post,' I would have declined to approve the application. In approving the application of Joseph Weatherby Hale, I relied upon the answer of Joseph Weatherby Hale given to the medical examiner of the company, Dr. T. Forney-Duval, as shown from Exhibit 3, above referred to, that the said Joseph Weatherby Hale had never had or been treated for the condition shown and set forth in the foregoing previous page. In approving the application of Joseph Weatherby Hale, I also relied upon the answers of Joseph Weatherby Hale to question 15 in the application (Exhibit 2 above referred to) and questions 5(C), 5(L), and 6, as shown by the questions to be asked by the medical examiner (Exhibit 3 above referred to). If the answers to questions in Exhibit 3 had been correctly made and answered, and showing the above facts, I would have declined to approve the application, and I would not have approved the application for the issuance of a policy of noncancellable income insurance thereon, by the Pacific Mutual Life Insurance Company of California, to Joseph Weatherby Hale."

Dr. Bellamy of Wilmington, N. C., testified that he treated appellee in April, 1923, and found him suffering with tuberculosis of the left lung accompanied by pleurisy. The sputum was negative for tubercular bacilli. In his opinion the disease was in the incipient stage and had existed for about six weeks. Dr. Bellamy further testified:

"At the time of that consultation, Mr. Hale stated that several years before he had consulted Dr. J. F. Robertson, of Wilmington, N. C., on account of a cough and cold that he had at that time, and that Dr. Robertson told him that he would not make a diagnosis of his condition, but advised him to consult Dr. Minor, in Asheville. Mr. Hale stated that within a week after consulting Dr. Robertson the cough and cold disappeared, and that he was entirely well and had had no further cough or cold until shortly before consulting me in April, 1923. * * *"

Dr. Price, of El Paso, Tex., testified that plaintiff had been under treatment by him for tuberculosis since May, 1923, and in his opinion plaintiff had had the disease but a short time and he was improving. He further testified:

"Some cases of tuberculosis get arrested, become quiescent. Tuberculosis can develop, and then reach a quiescent or arrested stage, and by reason of some extra exertion, or other causes, break out at once, and it does do so at times. Nobody can tell when this tuberculosis first developed in him, when it first came into his body. The only way we can do is go back on the symptoms. I didn't see him in 1919 or 1920, I didn't see him until 1923. I see what Dr. Robertson says, and how he diagnosed it at that time, and his recommendation. On the basis of that history, I would say that tuberculosis did not exist in 1919 or 1920. Eliminating that history, I couldn't say he didn't have it in 1919 or 1920, but in my judgment he didn't. I wouldn't make a diagnosis of tuberculosis from his findings. * * * From that examination, I would not conclude that the patient had tuberculosis, that sounds more like he had a stone in the kidney, or kidney cholic, than anything else. That examination does not indicate to me tuberculosis. If there was also an X-ray taken of the lungs, which was negative, that is very strong evidence it was not tuberculosis."

Drs. Hendricks, Homan, and Miller, of El Paso gave their opinions based upon Dr. Robertson's statement of his findings in January, 1920.

Dr. Hendricks testified:

"I would place the plaintiff in the category of a tubercular suspect at that time."

Dr. Homan testified:

"From those facts I would say that a positive diagnosis of tuberculosis would not be authorized, but as a tubercular suspect, or feeling that there was a possibility that there was tuberculosis, would be, and would justify, further investigation in the case. With a history of influenza, and physical findings of rales, rough breathing, and thickened pleura in the chest, one would strongly suspect tuberculosis, and

would keep the patient under observation and make further investigation. If that same person, in April, 1923, three years and a few months later, had gone to the doctor, at which time he had fever and pain in his left chest, which had begun five days before he consulted the doctor, when he expectorated some bloody sputum containing streaks and clots of blood, the bloody streaks continuing for three days, that his temperature at 5 p. m. on that day was 99.4, pulse 100, respiration 30, good appetite, slept all right, urine examination showed no albumen, no sugar, no white blood cell, examination showed friction rub and dry rales in the left chest at the anterior exillary line at about the level of the second to fifth rib—if that condition was·found three years and four months later, I would say that it was a natural result of the finding in December, 1919, or January, 1920, I would think he had been tuberculous all the time. * * *"

Dr. Miller testified:

"Under the foregoing facts I would regard him as tubercular."

The testimony of all the medical experts shows that pulmonary tuberculosis may become arrested or quiescent and then suddenly recur. According to the plaintiff's testimony, after leaving the hospital in January, 1920, he resumed his work as a shipping clerk and stenographer, and worked constantly up until his breakdown in April, 1923; that his working hours were from 9 to 14 hours a day, and his place of employment in a low malarial country, and during this time he was in good health with no sickness and gained about 30 pounds in weight.

[3] Sections 6289 and 6483 of the Consolidated Statutes of North Carolina read as follows:

Section 6289: "*Statements in Application Not Warranties.* All statements or descriptions in any application for a policy of insurance, or in the policy itself, shall be deemed representations and not warranties, and a representation, unless material or fraudulent, will not prevent a recovery on the policy."

Section 6483: "*False Statement in Application.* The falsity of any statement in the application for any policy covered by this subchapter shall not bar the right to recovery thereunder unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer."

It is shown that section 6289 applies to life insurance policies, while section 6483 applies to the combination policy issued to Hale.

Mr. Carr, an attorney and counselor at law, of Wilmington, N. C., testified that section 6289 had been several times construed by the Supreme Court of that state, citing the cases, but that the latter section had not. He stated that under the law of that state the truth or falsity of a representation is for the jury to decide, whereas·the materiality of the same is for the court to decide. However, Mr. Carr evidently did not intend to imply that in every case the question of materiality is exclusively for the court, for he refers to the case of Hines v. Casualty Co., 172 N. C. 227, 90 S. E. 131, L. R. A. 1917B, 744, which he says "will explain just how the question of materiality should be submitted to the jury when the question of materiality is for the jury."

The Hines Case is not very enlightening to us upon the question of when the materiality of a representation is for the jury or the court under the law of North Carolina. In this connection see also Mutual Life Insurance Co. v. Leaksville Woolen Mills, 172 N. C. 534, 90 S. E. 574, and Gardner v. North State Life Ins. Co., 163 N. C. 367, 79 S. E. 806, 48 L. R. A. (N. S.) 714, Ann. Cas. 1915B, 652, which indicate that the question of materiality is frequently for the jury to decide.

From the cases cited by Mr. Carr we are unable to definitely determine when the question of materiality is for the court or the jury, but it is clear that the courts of that state frequently treat proven misrepresentations to be material as a matter of law. Mutual Life Insurance Co. v. Leaksville Woolen Mills, supra; Bryant v. Metropolitan Life Ins. Co., 147 N. C. 181, 60 S. E. 983; Gardner v. North State Life Ins. Co., 163 N. C. 367, 79 S. E. 806, 48 L. R. A. (N. S.) 714, Ann. Cas. 1915B, 652; Schas v. Equitable Life Insurance Co., 166 N. C. 55, 81 S. E. 1014; Hardy v. Phoenix Mutual Life Ins. Co., 167 N. C. 23, 83 S. E. 5.

In response to a hypothetical question based upon the findings testified to by Dr. Robertson, Mr. Carr further testified:

"In my opinion the insurance company issuing a policy to such applicant would have the right to rescind and cancel the policy, and, under the laws of the state of North Carolina, the misrepresentations referred to would be regarded as material and affecting the acceptance of the risk and the hazard assumed by the insured to the extent of voiding the policy. * * *"

Also: "In my opinion the question of the materiality of the information not divulged in the application for the policy in suit is not for the jury but for the court."

In Schas v. Equitable Life Ins. Co., supra, the applicant for life insurance stated he had not consulted a physician during the two preceding years, when in fact he had been treated by several physicians during that time. There was also evidence that he had been afflicted with a serious nervous disease which increased in intensity until he died. This case reviews the previous decisions upon the materiality of representations. In that case.it is said:

"Every fact which is untruly stated or wrongfully suppressed must be regarded as material, if the knowledge or ignorance of it would naturally·and reasonably influence the judgment of the underwriter in making the contract, at all,

or in estimating the degree or character of the risk, or in fixing the rate of premium. 16 Am. & Eng. Enc. of Law (2d Ed.) 933; Vance on Insurance, 284. This definition was adopted by us in Fishblate v. Fidelity Co., 140 N. C. 589, 53 S. E. 354, and has since been approved several times, and is also the definition of other courts. Bryant v. Insurance Co., 147 N. C. 181, 60 S. E. 983; Alexander v. Insurance Co., 150 N. C. 536, 64 S. E. 432; Annuity Co. v. Forrest, 152 N. C. 621, 68 S. E. 139; A. L. Insurance Co. v. Conway, 11 Ga. App. 557, 75 S. E. 915; Maddox v. Insurance Co., 6 Ga. App. 681, 65 S. E. 789; Talley v. Insurance Co., 111 Va. 778, 69 S. E. 936; Penn M. Life Insurance Co., v. N. S. & Trust Co., 73 Fed. 653, 19 C. C. A. 316, 38 L. R. A. 33; 3 Cooley's Briefs on Insurance, p. 1953; Vance on Insurance, pp. 267, 269. It may be stated as a general rule that where, in an application for insurance, a fact is specifically inquired about, or the question is so framed as to call for a true statement of the fact, or to elicit the information desired, reason and justice alike demand that there should be a full and fair disclosure of the fact, or at least a substantial one. 3 Cooley's Briefs on Insurance, p. 2009 (d). Our case is not essentially different from Alexander v. Insurance Co., supra, in which the court said: 'The company was imposed upon (whether fraudulently or not is immaterial) by such representations and induced to enter into the contract. In such case it has been said by the highest court that, "assuming that both parties acted in good faith, justice would require that the contract be canceled and premiums returned." Insurance Co. v. Fletcher, 117 U. S. 519 (6 Sup. Ct. 837, 29 L. Ed. 934)'—citing Bryant v. Insurance Co., supra. as decisive of the question. Our statute (Revisal of 1905, § 4808) affirms this view, for while it declares that all statements in an application for insurance shall be construed as representations merely, and not as warranties, it further provides that no representation, unless material or fraudulent, shall prevent a recovery, the meaning of which plainly is that a material representation shall avoid the policy, if it is also false and calculated to influence the company, without notice of its falsity, in making the contract at all, or in estimating the degree and character of the risk, or in fixing the premium. Bryant v. Insurance Co., supra.

"Our case is well within this rule. It is not necessary, as said in Fishblate's Case, that the act or conduct of the insured, which was represented by him in the application, should have contributed in some way or degree to the loss or damage, for which the indemnity is claimed. Whether it was material depends upon how, if at all, it would have influenced the company in the respect we have just stated. The determining factor, therefore, in such case is whether the answer would have influenced the company in deciding for itself, and in its own interest, the important question of accepting the risk, and what rate of premium should be charged. The questions generally are framed with a view to estimating upon the longevity of the applicant, and any answer calculated to mislead the company in regard thereto should be considered as material. There are some contingencies that cannot be provided against; but the company is entitled to have a fair and honest answer to every question, which will enable it to exercise its judgment intelligently, and to have the necessary information as a basis upon which to make its calculations, although its best deduction therefrom may only approximate the actual result in the particular case. 3 Cooley's Briefs on Law of Insurance, pp. 1952, 1953; Insurance Co. v. Conway, 11 Ga. App. 557, 75 S. E. 915. The applicant is required to act in the utmost good faith in giving the information. Insurance Co. v. Conway, supra. In life insurance it is important for the company to know the individual history and characteristics of the applicant, his idiosyncracies, or the peculiarities of his mental and physical constitution or temperament, and his environment at the time of his application. In no other way could the risk or hazard be well determined, or the premium fixed. Is he weak in body or in mind, and, if so, to what extent, and in what particular way, and what are his inherited traits or the mental and physical characteristics of his progenitors? The inquiry must be, not only individual, but ancestral, and the investigation searching as to his past life and future intentions, as experience has shown, in order to make anything like a reliable estimate of the risk incurred. And his habits and surroundings are also to be known, considered, and weighed. Has he been exposed to any contagious, infectious, or transmissible disease? is a perfectly legitimate inquiry. Does he propose to change his residence, so that his exposure to climatic or other diseases will be greater, and the hazard correspondingly increased? These and many other questions of like kind any prudent man engaged in the business of life insurance would be more than likely to ask, and the answers to them would surely tend to shape the judgment of the underwriter and influence his decision in regard to the risk. Any insurance company that would issue a policy or contract for insurance upon any other basis, and without proper inquiry, would be so reckless as to forfeit the confidence of the public.

"The foregoing was the language we used in Gardner v. Insurance Co., 163 N. C. 367, 79 S. E. 806, and, as it is closely applicable to this case, we repeat it here. We need only add what was decided by this court in Bryant v. Insurance Co., 147 N. C. 181, 60 S. E. 983, as follows: (1) Under Revisal, § 4808, providing that statements or descriptions in application for policies of life insurance, or in the policy itself, are to be construed as representations, and not as warranties, and shall not prevent a recovery, unless material, it is not necessary to defeat a recovery that a material misrepresentation by the applicant should contribute in some way to the loss for which indemnity is claimed. (2) In an application for a policy of life insurance, every fact stated will be deemed material, under Revisal, § 4808, which would materially influence the judgment of the insurance company either in accepting the risk or in fixing the premium rate. (3) When it appeared that the insured, in his application for a policy of life insurance, made a statement that he had not been under the care of a physician within twelve months next preceding its date, it was not necessary that he should have been bedridden to constitute the relationship, for, if he was apprehensive as to his condition, though 'up and around,' within the time named, consulted a physician, and intrusted his case to him, it would be a material representation, and, if false, would relieve the defendant from the

obligation of the contract by reason of the death of the insured. (4) It was error in the court below not to submit a determinative issue to the jury for their finding as to the truth of a statement made by the applicant that he had not been under the care of a physician within two years next preceding the date of the application, when there was evidence proper for the consideration of the jury upon that question. (5) When there was evidence that the insured made a misrepresentation in his application for a policy of life insurance, that he had not been under the care of a physician within two years, such conditions and relevant facts and circumstances relating to the truth or falsehood of the statement should be determined by the jury upon a proper issue.

"In this case it appears that the insured was under the care of a physician, Dr. Sevier, a very short while before the application was made for the policy, and also under the treatment of other physicians, a half dozen of them, in the years 1911 and 1912, and there is room for the inference that he was under the care of a doctor almost immediately before he made the representation. In either of the events mentioned, and if the evidence is true, he could hardly have failed to know that his representation was false, nor could he well have forgotten the fact of treatment so soon after it occurred. That it was material for the company to know the state of his health and his physical and mental condition in order to decide whether it would issue the policy, and, if issued, to determine the amount of the premiums, will hardly be questioned. Whether the representation was made by him, and, if made, whether it was false, are, of course, questions for the jury."

We conclude from the consideration of the North Carolina decisions that the false representation concerning plaintiff's previous illness and consultation and treatment by a physician must be treated as material as a matter of law, as affecting the acceptance of the risk and the hazard assumed by the insurer.

The appellee admits that in January, 1920, he consulted Dr. Robertson "for—well, the first, I had a fever, he said it was typhoid fever, and sent me to the hospital, and he pronounced it a cold." He further admits that he stayed there five days under observation, had an X-ray made of his chest, and his sputum examined. He says that Dr. Robertson could not find anything the matter with him, but advised him to see a specialist and recommended Dr. Minor, and that Dr. Robertson told him Dr. Minor was a tubercular and chest specialist and advised him to go there for examination. The inference is unavoidable from appellee's own admissions that Dr. Robertson at that time regarded him as a tubercular suspect and plaintiff knew it but disagreed with the doctor.

[4] The present case is very similar to Fidelity, etc., v. Harris, 94 Tex. 25, 57 S. W. 635, 86 Am. St. Rep. 813, in which was considered a policy governed by the laws of Pennsylvania. In that case untrue statements were made in the application concerning previous medical treatment and consultation with physicians. Provisions in the application and policy made the statements warranties, but perforce a statute of Pennsylvania the untruthfulness thereof did not avoid the policy, unless the same related to some matter material to the risk. The following language by Judge Williams in that case is applicable here, viz.:

"It thus appears that by the law of Pennsylvania, statements such as those made in Harris' application concerning previous medical attendance are material to the risk, and when untrue, avoid the policy. This is a rule of substantive law and not merely one of procedure. How it is to be made effectual in the trial of a case, whether by peremptory instruction or by a declaration in the charge that the matter is material, or by setting aside a verdict rendered in disregard of it, is a question of procedure, and we agree with the Court of Civil Appeals that the practice in Pennsylvania, as shown by these decisions, is not materially different from our own. In both states, when the evidence is clear and uncontroverted, it is error to submit the question to the jury and error to allow a verdict thus against the law and evidence to stand. That the representations under discussion were material is sufficiently shown by the quotations from the decisions. See, also, Bliss on Life Ins.; Cobb v. Mut. Ben. Assn., 26 N. E. Rep. 230; Numrich v. Supreme Lodge, etc., 3 N. Y. Supp. 553. It may be true that an error in statement in an application concerning medical attention might, in some cases, appear to be immaterial, but this cannot be held as to those in this case.

"Applying to the contract the law most favorable to defendant in error, we must hold the policy was avoided by representations which were both false and material. And, as the facts are undisputed, there is no reason for remanding the case. The judgments of the Court of Civil Appeals and the district court are reversed, and judgment will be here rendered for plaintiff in error."

Appellee suggests that the materiality of false representations relates merely to the remedy, and is governed by article 4959, R. S., of this state but this is a matter of substantive law as held by Judge Williams in the quotation above. We are of the opinion the court erred in refusing the requested peremptory instruction, and that the answers of the jury to the first two questions propounded by the court, and to question No. 1, submitted at the request of the defendant, are unsupported by the evidence.

[5] The finding that plaintiff was without intent to deceive in failing to mention the fact of his illness in 1919 or 1920 and his treatment by Dr. Robertson is sustained. We also sustain the findings made in response to questions 2 and 4, submitted at request of defendant. The findings sustained are immaterial in view of the ruling upon the materiality of the false representations concerning the illness and treatment in Decem-

ber 1919, or January, 1920, under the North Carolina statute.

The cause is reversed, and judgment here rendered that the plaintiff take nothing, and in favor of the defendant upon its cross-action.

Reversed and rendered.